# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ERNESTO EVARISTO URIBE,

Defendant-Appellant.

UNPUBLISHED
January 3, 2019

No. 338586
Eaton Circuit Court
LC No. 13-020404-FC

Before: BOONSTRA, P.J., and JANSEN and GADOLA, JJ.

PER CURIAM.

Defendant appeals by right his convictions, following a jury trial, of four counts of criminal sexual conduct in the first degree (CSC I) (victim under 13), MCL 750.520b(1)(a). The trial court sentenced defendant, under MCL 750.520b(2)(b),[1] to concurrent terms of 50 to 75 years' imprisonment for each offense. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arise from separate acts of sexual penetration of his stepdaughter, VG, that first occurred when she was 5 years old and continued until she was 9 years old. Defendant was charged in January 2014. In March 2014, the trial court granted defendant's motion to suppress the testimony of his biological daughter, JU, concerning her disclosure of sexual abuse by defendant occurring in 2011. The prosecution applied to this Court for leave to appeal; this Court granted leave to appeal and reversed the trial court's suppression of JU's testimony. See *People v Uribe*, 310 Mich App 467, 475; 872 NW2d 511 (2015), vacated by 499 Mich 921 (2016). In 2016, our Supreme Court vacated this Court's judgment, but nonetheless reached the same result and concluded that the trial court had erred by excluding JU's testimony. See *People v Uribe*, 499 Mich 921, 974; 878 NW2d 474 (2016).

---

[1] MCL 750.520b(2)(b) provides that an offender 17 years of age or older who is convicted of CSC I against an individual less than 13 years of age may be sentenced to imprisonment for life or any term of years, but not less than 25 years.

Meanwhile, on June 18, 2015, after this Court's decision on the prosecution's appeal, the trial court held a hearing on several motions filed by defendant. During the motion hearing, the parties discussed an open plea offer by the prosecution under which it would agree to dismiss the four counts of CSC I in return for defendant's plea of guilty to three counts of criminal sexual conduct in the second degree (CSC II), MCL 750.520c(1)(a), and would further agree to a sentence of 5 years' imprisonment. The parties then engaged in a discussion of the sentencing guidelines range applicable to the CSC I offenses with which defendant was charged, as compared with the sentencing guidelines range applicable to the CSC II offenses that were the subject of the plea offer. The prosecution stated that the former guidelines range was 135 to 225 months' imprisonment, while the latter guidelines range was either 36 to 71 months' or 43 to 86 months' imprisonment, depending on how many points were assessed for offense variables. The prosecution stated that it would like to "leave the offer open until July 17th at this point." No one mentioned the 25-year mandatory minimum sentence for a CSC I conviction at this hearing. Defendant did not accept the plea offer.

Before trial, the prosecution filed a motion in limine to preclude defendant from introducing evidence that VG's biological father had been convicted of attempted sexual assault. At the hearing on the prosecution's motion, the trial court heard testimony from VG's mother that the conviction arose from acts that occurred when VG's father was 18 years of age and involved consensual sex with a girl who said she was 16 years of age but "ended up being younger than that." She also testified that VG's father had never stayed overnight with her and VG during any of the time periods in which VG testified the abuse against her had occurred. The trial court granted the prosecution's motion.

At trial, VG testified to four instances in which defendant had penetrated her anus with his penis. VG testified that after the first incident, defendant told her not to tell anyone or he would kill her father. VG believed him, because she had witnessed part of a fight between defendant and her father that had resulted in injuries to her father's face and his earrings being ripped out.

VG first disclosed defendant's abuse to two of her friends in 2012, when she was 13 years old. In September 2012, she disclosed defendant's abuse to her mother, who contacted the Lansing Police Department. VG's case was assigned to Detective Vicki Dahlke. Detective Dahlke interviewed VG and testified at trial that she had no evidence at the time of the interview that would have led her to explore the possibility that VG might have been abused by a perpetrator other than defendant. Detective Dahlke referred VG to Dr. Stephen Guertin at Sparrow Hospital for examination.

Dr. Guertin was qualified as an expert in the areas of child sexual abuse, child abuse, and pediatric care. He testified that he examined VG in October 2012. Her physical examination revealed no "strictly abnormal" findings. Although there was an area of stretched skin at the top of VG's anus, Dr. Guertin testified that this condition could have resulted from numerous causes, including constipation or the passing of large stools. Dr. Guertin testified that he obtained a description of the sexual abuse from VG, and that this history was useful in numerous respects, including in determining what sexually transmitted diseases to check for, whether the child was safe, and whether the child needed mental health treatment. Dr. Guertin further testified to VG's description of defendant's abuse, which was consistent with VG's testimony at trial.

On cross-examination, defense counsel pointed out to Dr. Guertin that he had not diagnosed VG as a victim of sexual abuse. Dr. Guertin stated that he felt that "the report, pretty much, speaks for itself in that regard. But if you're asking me do I consider to—her to be a victim, I do." On recross-examination, defense counsel again returned to this line of questioning and repeatedly asked Dr. Guertin about the lack of a diagnosis. Dr. Guertin replied that in his opinion there was "no question" that VG had been sexually abused, that he had "held that opinion since" the interview, that his report "supports that she was sexually abused," and that "based on her history" he believed that she had been sexually abused.

Following Dr. Guertin's testimony and outside the presence of the jury, the trial court noted that Dr. Guertin appeared to have testified that a sexual assault had occurred and had improperly vouched for the veracity of VG's testimony. Defense counsel moved for a mistrial, arguing that a curative instruction would not remedy the effect of Dr. Guertin's testimony on the jury. The trial court denied the motion, concluding that a limiting instruction was sufficient. The trial court instructed the jury that the report Dr. Guertin had referenced was not in evidence because it was inadmissible under the Michigan Rules of Evidence and that the jury should not consider any statements made by Dr. Guertin concerning his report. The trial court also instructed the jury that Dr. Guertin was not permitted to opine that a sexual assault had occurred, that it was striking Dr. Guertin's testimony to that effect, that the jury was not to consider Dr. Guertin's opinion regarding whether a sexual assault had occurred, and that a determination whether a sexual assault had occurred was "your decision and only your decision to make."

Dr. James A. Henry testified as an expert in child trauma and the behavior of sexually abused children. He testified that it was common for children to delay disclosure of sexual abuse and to initially make the disclosure to a friend rather than an authority figure.

JU testified regarding an incident that had occurred in the summer of 2011. She testified that she had been sleeping in a bed with her stepmother and defendant when defendant placed his hand under her pants and underwear and touched her genital area and buttocks. Defendant's parental rights to JU were terminated after she disclosed this incident.

Dr. David Luginbill, VG's family physician, testified that he had treated VG since her birth. He had treated her for attention deficit disorder and migraines, and treated urinary tract infections in 2004 and 2010. Dr. Luginbill testified that he examined VG's genitalia in 2004 and 2010 in the course of treating her urinary tract infections, but that generally examinations of the vaginal/anal area were "deferred" unless the child had a specific complaint.

Defendant's fiancée, Elizabeth Hall, testified on defendant's behalf, stating that from 2008 until 2012, after defendant and VG's mother had separated, defendant had biweekly visitations with his two biological children (VG's half-sisters). VG and her half-sisters lived with their mother at various residences during that time. Hall testified that VG would ask defendant if she could come along when defendant and Hall picked up her half-sisters for the visitations.

Dr. Sharon Hobbs also testified on defendant's behalf and was qualified as an expert in clinical psychology, the behavior of children who have been sexually abused, and the treatment and counseling of sexually abused children and teenagers. Dr. Hobbs opined that psychological

evaluations were very important in cases of sexual abuse of children where the allegations could not be corroborated with physical injuries. Dr. Hobbs testified regarding the types of behaviors a child might exhibit after being sexually abused, and discussed psychological defenses such as displacement, disassociation, and transference.

The jury convicted defendant as described. After defendant was sentenced, he appealed to this Court. Among other issues raised on appeal, he requested that this Court remand for a *Ginther*[2] hearing regarding whether his trial counsel had been ineffective for failing to inform him of the 25-year mandatory minimum sentence for a CSC I conviction at the time he was considering the prosecution's plea offer. This Court granted his motion to remand.[3]

At the *Ginther* hearing, defendant's trial counsel, attorney Daniel Pawluk, testified to having discussed the prosecution's plea offer with defendant. Pawluk further testified to having specifically discussed with defendant the 25-year mandatory minimum sentence for a CSC I conviction. Pawluk also testified that, in a meeting held in May 2015, he discussed with defendant the risks of rejecting the prosecution's plea offer, including the risk of a mandatory minimum sentence of 25 years for a CSC I conviction. Pawluk acknowledged that there appeared to be an "inaccuracy" in the discussion between the court and the parties at the June 18, 2015 hearing concerning defendant's potential minimum sentence. However, he testified that he discussed the 25-year mandatory minimum sentence with defendant "several times" after the June 18 hearing in the context of discussing the risks of rejecting the plea offer. Pawluk also testified that he did not remember defendant ever being willing to take the plea offer and remembered that defendant repeatedly stated that the prosecution had no evidence. According to Pawluk, defendant did state on one occasion that he would entertain a plea offer of two years' imprisonment.

Defendant testified that he was not aware of the 25-year mandatory minimum sentence for CSC I convictions and that, had he been aware of the risk, he would have accepted the prosecution's plea offer of five years' imprisonment. Defendant testified that he was innocent, and that he told Pawluk that he was innocent. He specifically denied any sexual abuse of VG. Pawluk's investigator, Chad Lab, testified that he recalled Pawluk discussing the 25-year mandatory minimum sentence with defendant, and defendant responding in a way that Lab believed indicated he understood. Lab also testified that defendant "vehemently denied" sexually abusing VG.

Following this Court's remand for a *Ginther* hearing, defendant moved for a new trial and for reinstatement of the plea offer. After the *Ginther* hearing, the trial court denied the motion finding that defendant had been informed of the 25-year minimum sentence by the judge at his arraignment, by his receipt of a copy of the information, and by Pawluk. The trial court found Pawluk's testimony credible and defendant's testimony not credible. The trial court did

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Uribe*, unpublished order of the Court of Appeals, issued March 2, 2018 (Docket No. 338586).

note that at the June 18, 2015 hearing defendant was informed that he could be sentenced to nearly 19 years in prison. However, the trial court found that even if defendant was not aware of the 25-year mandatory minimum sentence, he was not prejudiced because he had consistently maintained his innocence and would not have accepted the plea offer.

This appeal followed. Defendant filed a supplemental brief on appeal addressing the trial court's denial of his motion following the *Ginther* hearing.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that Pawluk was ineffective for failing to inform him of the mandatory minimum 25-year sentence he would receive if convicted of CSC I, and that the trial court therefore erred by denying his motion for a new trial and for reinstatement of the prosecution's plea offer. We disagree.

> Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law. "A judge must first find the facts, then must decide whether those facts establish a violation of the defendant's constitutional right to the effective assistance of counsel." We review the trial court's factual findings for clear error. Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake. We review de novo questions of constitutional law. [*People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011) (footnotes omitted).]

A defendant has the burden of establishing the factual predicate of his claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). "[A] defendant is entitled to the effective assistance of counsel in the plea-bargaining process." *People v Douglas*, 496 Mich 557, 591-592; 852 NW2d 587 (2014), citing *Lafler v Cooper*, 566 US 156, 162; 132 S Ct 1376; 182 L Ed 2d 398 (2012). To prove ineffective assistance of counsel in the plea-bargaining process, a defendant must satisfy the "familiar two-pronged standard" of demonstrating that his counsel's performance fell below an objective standard of reasonableness and that there was a reasonable probability that the defendant was prejudiced by that deficiency. *Id*. at 592 (citations omitted). In other words, "the defendant must show the outcome of the plea process would have been different with competent advice." *Id*. (quotation marks and citation omitted).

Our Supreme Court has stated that where "the alleged prejudice resulting from counsel's ineffectiveness is that the defendant rejected a plea offer and stood trial," a defendant must show that (1) he would have accepted the plea were it not for his counsel's ineffective advice, (2) the prosecution would not have withdrawn it, (3) the court would have accepted its terms, and (4) the conviction or sentence or both would have been less severe than the sentence that defendant received after trial. *Id*. at 592.

Here, as noted, the trial court found that defendant was informed of the 25-year mandatory minimum sentence by Pawluk and by the charging documents he received, as well as by the court at his arraignment. Defendant argues that the trial court erred by determining that Pawluk's testimony was more credible than his, because the record of the June 18, 2015 hearing reflects that Pawluk did not correct the prosecution's and trial court's erroneous comments

regarding the possible sentences that defendant could receive if he went to trial. We disagree. It is clear that there was some confusion between the prosecution and the trial court at that hearing concerning the minimum sentence defendant might receive under the guidelines if he (1) went to trial or (2) accepted the plea bargain. But Pawluk's failure to correct the record at a single hearing does not lead us to believe that the trial court clearly erred by crediting his testimony at the *Ginther* hearing, which was clear and unequivocal. Pawluk testified that he discussed the mandatory minimum sentence with defendant both before and after the June 18 hearing. The trial court was in a superior position to judge the credibility of the witnesses before it, *Shann v Shann*, 293 Mich App 302, 307; 809 NW2d 435 (2011), and we find no clear error in the trial court's finding that Pawluk's testimony was credible. *Armstrong*, 490 Mich at 289. Defendant has failed to establish the factual predicate for his claim. *Hoag*, 460 Mich at 6.

Defendant also argues that, even if Pawluk did inform him of the 25-year mandatory minimum sentence, he was given "conflicting advice" as a result of the June 18 hearing. We disagree that any such circumstance warrants relief. At the June 18 hearing, Pawluk stated that he had only had a "brief opportunity" to review the plea offer and wanted additional time to discuss the offer with his client. Pawluk testified that he did so, and that he specifically discussed the 25-year mandatory minimum sentence with defendant after the hearing. Defendant did not disprove this testimony, but rather admitted that it was possible that Pawluk's testimony was true and that he simply did not remember it, in the same way that defendant claimed not to remember being informed of the mandatory minimum sentence at his arraignment or reading the portions of the charging documents provided to him by his attorney that stated the mandatory minimum sentence for a CSC I conviction. Defendant did not reject the plea offer at the June 18 hearing; therefore, even if he was given the wrong impression at the hearing of the risks of rejecting the offer, Pawluk's testimony supports the conclusion that the confusion was rectified before the plea offer was rejected and that defendant was given sufficient advice to allow him to make an informed and voluntary choice between going to trial and agreeing to a guilty plea. See *Douglas*, 496 Mich at 594 (quotation marks and citation omitted). Again, defendant has failed to establish the factual predicate for his claim, *Hoag*, 460 Mich at 6, and has not demonstrated clear error, *Armstrong*, 490 Mich at 289.

Further, we agree with the trial court that even if Pawluk's performance was deficient, defendant cannot demonstrate prejudice. Although defendant argues that the record shows that he at one point expressed his willingness to consider a "two-year deal," defendant also steadfastly maintained his innocence throughout the case and even at the *Ginther* hearing. As the trial court noted, there was no indication that defendant would have accepted a plea that required him to admit to having sexually abused VG.[4] And, as the trial court pointed out, even assuming that defendant was never informed of the 25-year mandatory minimum sentence, he undisputedly knew that he risked a minimum sentence of almost 19 years if he went to trial, yet he refused a

---

[4] Although a reference was made at the *Ginther* hearing to the possibility of a no-contest plea, there is no evidence that such a plea offer was ever even discussed, much less offered, or that the trial court would have accepted such a plea and therefore refrained from questioning defendant about his participation in the offenses. See MCR 6.302(D).

plea deal with a substantially shorter period of incarceration. Defendant has not met his burden of showing prejudice, even if he satisfied the first prong of the ineffective assistance analysis. *Douglas*, 496 Mich at 592. Defendant has therefore not shown that his trial counsel was ineffective, and the trial court did not err by denying his motion for a new trial and for reinstatement of the plea offer.

## III. PROSECUTION'S MOTION TO PRECLUDE EVIDENCE OF VG'S FATHER'S PRIOR CONVICTION

Defendant also argues that the trial court erred by granting the prosecution's motion to preclude defendant from introducing evidence that VG's father had been convicted of a sex offense and was required to register as a sex offender. We disagree. We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *People v Steele*, 283 Mich App 472, 478; 769 NW2d 256 (2009). We review de novo whether a defendant was deprived of his constitutional right to present a defense. *People v Bosca*, 310 Mich App 1, 47; 871 NW2d 307 (2015).

Evidence must be relevant to be admissible. MRE 402; *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011). Relevant evidence is evidence that is helpful in shedding light on any material point. MRE 401; *People v Murphy* (*On Remand*), 282 Mich App 571, 580; 766 NW2d 303 (2009). However, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403; *People v Feezel*, 486 Mich 184, 198; 783 NW2d 67 (2010).

A defendant has a constitutional right to present a defense and to present evidence in support of that defense. *Bosca*, 310 Mich App at 47. But this right is not unlimited. *Id*. A defendant "must still comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt or innocence." *Id*. (quotation marks and citation omitted). "The Michigan Rules of Evidence do not infringe on a defendant's right to present a defense unless they are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. (quotation marks and citations omitted).

Here, defendant argues that he was denied the right to present a complete defense by the trial court's refusal to permit him to present evidence of VG's father's conviction. We disagree. VG's father was convicted of attempted CSC III 21 years earlier, when he was 18 years old, before VG was born. VG's mother testified that the incident involved consensual sex with a girl who had said she was 16 years old but who in fact was younger than that. There was no record evidence that VG's father had ever spent the night, or any significant time, in any of the homes in which the abuse of VG occurred. Detective Dahlke testified that she never received any evidence that led her to investigate any other perpetrators.

On these facts, the trial court did not abuse its discretion by prohibiting the admission of the proffered evidence. *Steele*, 283 Mich App at 478. Defendant was not prohibited from presenting a theory that VG's father or another individual had committed the acts of which defendant was accused; in fact, defendant presented expert testimony regarding the concepts of transference and displacement, and testimony at trial established that VG had visitation with her

father during the relevant time periods and that VG's family doctor had noted in 2010 that she disliked visiting her father. Defendant also elicited testimony about other adult men with potential access to VG during the relevant time periods.

Defendant merely asserts that the evidence of VG's father's conviction for attempted CSC III would have aided his defense. However, such evidence could only have aided his defense if the jury were to believe that VG's father was more likely than defendant to have committed the crime by virtue of a past attempted CSC conviction. We are not convinced of the relevance of this evidence in light of the specificity of VG's testimony regarding where and when the assaults occurred and VG's mother's testimony that VG's father had never spent the night at those locations. But even assuming that evidence of VG's father's conviction was marginally relevant, we agree with the trial court that such relevance would be substantially outweighed by the possibility of misleading the jury and confusing the issues. The trial court did not elaborate on precisely how the evidence could mislead the jury, but, for example, admission of this evidence may have encouraged the jury to view its task as identifying a sexual abuser rather than determining whether defendant had committed the specific acts charged. Admission of this evidence, without more, would also invite the jury to speculate about VG's father's guilt based solely on his character as evidenced by his past conviction. Admission of character evidence in order to prove conduct in conformity with that character is generally impermissible, see MRE 404, MRE 608.[5] We conclude that the trial court did not abuse its discretion by finding that the risk of confusion and misleading the jury substantially outweighed any probative value the evidence may have had. MRE 403; *Steele*, 283 Mich App at 478. Nor did the trial court's application of the Michigan Rules of Evidence deprive defendant of his right to present a defense. *Bosca*, 310 Mich at 47.

Additionally, even if the trial court did abuse its discretion by precluding the admission of this evidence, we would find the error to be harmless in light of the overwhelming evidence against defendant. See *People v Snyder* (*After Remand*), 301 Mich App 99, 111-112; 835 NW2d 608 (2013).

## IV. DR. GUERTIN'S TESTIMONY

Defendant raises two issues with respect to Dr. Guertin's expert testimony. Defendant argues that the trial court erred by (1) admitting hearsay testimony from Dr. Guertin concerning statements VG made during his examination of her, and (2) by not granting defendant's motion for a mistrial after Dr. Guertin improperly opined that VG had been sexually assaulted. Again, we review for an abuse of discretion a trial court's decision to admit or exclude evidence. *Steele*, 283 Mich App at 478. We review de novo preliminary questions of admissibility, such as the interpretation of the rules of evidence. *People v Jambor* (*On Remand*), 273 Mich App 477, 481; 729 NW2d 569 (2007). We review for an abuse of discretion a trial court's decision to deny a

---

[5] MCL 768.27a allows the prosecution to offer evidence of a *defendant's* commission of listed sex offenses to be considered for any relevant purpose, but does not, by its plain language, allow the admission of such evidence concerning witnesses or non-testifying parties.

motion for a mistrial. *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). "A mistrial should be granted only where the error complained of is so egregious that the prejudicial effect can be removed in no other way." *Id.*

## A. ADMISSION OF HEARSAY TESTIMONY

Defendant first argues that the trial court should not have allowed Dr. Guertin to testify to statements made by VG during her exam that corroborated her testimony at trial, because the statements were inadmissible hearsay. We disagree.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801. Hearsay is inadmissible unless subject to an exception. MRE 802. MRE 803(4) provides an exception for the following types of hearsay statements:

Statements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

Defendant points out that this Court has recently declared statements by a complainant made to Dr. Guertin during an exam to be inadmissible hearsay. See *People v Shaw*, 315 Mich App 668, 674-676; 892 NW2d 15 (2016). Defendant argues that *Shaw* compels the same result in the instant case. We disagree. While the factual situation in *Shaw* was similar in many ways, inasmuch as it involved a complainant who was referred to Dr. Guertin by the police after disclosing sexual abuse that had occurred years earlier, there are important differences that we believe compel a different result in this case.

The Court in *Shaw* said the following about the inadmissibility of Dr. Guertin's statements:

We agree with defendant that MRE 803(4) does not apply under the circumstances presented here. First, the examination by Guertin did not occur until seven years after the last alleged instance of abuse, thereby minimizing the likelihood that the complainant required treatment. Second, the complainant did not seek out Guertin for gynecological services. Rather, she was specifically referred to Guertin by the police in conjunction with the police investigation into the allegations of abuse by defendant. And during the seven years since the last alleged incident of abuse, she had seen a different physician, who was not called as a witness, for gynecological care. Under these facts, the complainant's statements to Guertin were not admissible because they were not statements for the purposes of medical treatment. [*Shaw*, 315 Mich App at 22.]

The complainant in *Shaw* was an adult at the time of the disclosure. *Shaw*, 315 Mich App at 671.

Unlike the complainant in *Shaw*, VG was still a child when she was referred to Dr. Guertin, a pediatrician. Dr. Guertin's testimony about his employment does not indicate that he ever treats adult patients in any capacity, but does diagnose and treat children. And Dr. Guertin testified that the history he took from VG had numerous medical purposes, such as focusing the testing for particular sexually transmitted diseases (of which VG may have been a "carrier" but not subject to obvious symptoms), providing information on what parts of VG's body should be checked for latent injuries, and providing information on whether VG needed psychological care and counseling. Like the complainant in *Shaw*, VG had seen a different physician in the years since the abuse; however, in VG's case, Dr. Luginbill was called to testify. His testimony did not indicate that he had ever examined or tested VG for sexually transmitted diseases, or that he had specifically examined her anus as an area of concern, although he did testify to a visual examination of the outside of vaginal and anal areas done in conjunction with diagnosing and treating her urinary tract infections in 2004 and 2010.

Unlike the adult complainant in *Shaw*, who could not have reasonably expected that a pediatric specialist would provide her with medical treatment when discussing her past abuse, VG could have possessed the "self-interested motivation to speak the truth to treating physicians in order to receive medical care" that underlies the rationale for admission of statements under MRE 803(4). *People v Meeboer* (*After Remand*), 439 Mich 310, 322; 484 NW2d 621 (1992). This is especially true considering that Dr. Luginbill had not historically provided the same type of treatment. And the statements were reasonably necessary to the diagnosis and treatment of VG. *Id*. As the *Shaw* Court acknowledged, "An injury need not be readily apparent. Moreover, '[p]articularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment.' " *Shaw*, 315 Mich App at 674-675 (citation omitted), quoting *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011).

We conclude that enough differences exist between this case and *Shaw* that *Shaw* does not compel us to reach a similar outcome. Rather, Dr. Guertin's testimony shows that VG's "recitation of the totality of the circumstances of the assault" was properly admitted under MRE 803(4), notwithstanding that they may also have been useful in the forensic investigation of her allegations. *Mahone*, 294 Mich App at 215; see also *Shaw*, 315 Mich App at 693 (JANSEN, J., dissenting).

Further, even if Dr. Guertin's testimony regarding VG's statements was inadmissible, these statements were cumulative to the clear and unambiguous testimony she gave at trial. VG's testimony alone was sufficient to convict defendant, see MCL 750.520h, and we are not convinced that Dr. Guertin's testimony was outcome determinative, especially in light of the trial court's curative instruction, discussed more fully below. See *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013).

## B. DENIAL OF MOTION FOR MISTRIAL

Defendant also argues that the trial court erred by denying his motion for a mistrial after Dr. Guertin opined that VG had been sexually abused. We disagree. Defendant simply asserts

that the trial court's curative instruction did not alleviate the harm of Dr. Guertin's admittedly improper testimony. See *People v Beckley*, 434 Mich 691, 727; 465 NW2d 391 (1990) (holding that an expert may not offer a direct opinion on the question of whether sexual abuse occurred). But generally "an unresponsive, volunteered answer to a proper question is not cause for granting a mistrial." *Gonzales*, 193 Mich App at 266. Further, although defendant argues to the contrary, it appears from context that defense counsel did to some extent "open the door" to the impermissible testimony by repeatedly questioning him about the lack of a diagnosis in his report. Defense counsel's questions "left open the possibility that the expert would respond negatively and in a manner that could be construed as an expert conclusion with regard to the truthfulness of the victim's allegations." *Beckley*, 434 Mich at 731.

In any event, the trial court gave a lengthy curative instruction that was approved by both parties. Curative instructions are generally presumed to cure the prejudicial effect of the inadmissible statements because the jurors are presumed to follow these instructions unless there is an "overwhelming probability" that the jury will be unable to do so. *People v Dennis*, 464 Mich 567, 581; 628 NW2d 502 (2001). Defendant points out that Dr. Guertin's opinion may have had a stronger impact on the jury because of a lack of physical evidence supporting VG's allegations; however, defendant does not provide evidence to suggest an overwhelming probability that the jury was unable to ignore the trial court's instruction. We conclude that the trial court did not abuse its discretion by denying defendant's motion for a mistrial. *Gonzales*, 193 Mich App at 266.

Additionally, defendant argues that the trial court gave a limiting instruction regarding the testimony of Drs. Henry and Hobbs, but not Dr. Guertin, and that this lack of a limiting instruction regarding Dr. Guertin strengthened the prejudicial effect of Dr. Guertin's improper testimony. Defendant is factually incorrect. The jury was given the curative instruction regarding Dr. Guertin on the third day of trial, and delivered its verdict on the fourth day of trial. Before deliberations, the trial court instructed the jury that it could not consider the testimony of Drs. Hobbs and Henry (who testified on the third day of trial, after the trial court had given its instruction regarding Dr. Guertin) to show that VG was abused, that defendant abused her, or that VG was telling the truth. The trial court then stated "Also in your books, ladies and gentlemen, will be the two special limiting instructions that I gave you yesterday concerning Dr. Guertin." In other words, while the trial court did not repeat verbatim the curative instruction that it had given the jury only the day before, the jury was provided with a written copy of that instruction and the trial court reminded the jury of it directly before deliberations began. And any objection by defense counsel to the trial court's instructions at the close of proofs would have been futile, or at best would have resulted in the trial court reading verbatim the same instruction it provided in written form and had read to the jury the previous day. Defense counsel was not ineffective for failing to make such an objection. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003).

V.  SUFFICIENCY OF THE EVIDENCE/GREAT WEIGHT OF THE EVIDENCE

In his Standard 4 brief,[6] defendant argues that his convictions were based on insufficient evidence or were against the great weight of the evidence.  We disagree.  Both of defendant's arguments are based on the lack of physical evidence and defendant's assertion that VG's testimony was not credible.  When reviewing the sufficiency of the evidence, we will not interfere with the jury's role in determining the credibility of witnesses.  *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2001).  Rather, we view the evidence in the light most favorable to the prosecution to determine if a reasonable juror could find the elements of the crime proven beyond a reasonable doubt.  *Id*. at 300.

> A defendant is guilty of CSC–I, MCL 750.520b(1)(a), if he or she engaged in sexual penetration with the victim and the victim was less than 13 years old.  *People v Hack*, 219 Mich App 299, 303; 556 NW2d 187 (1996).  "Sexual penetration" is defined by statute as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of another person's body. . . ."  MCL 750.520a(r).  [*People v Solloway*, 316 Mich App 174, 181; 891 NW2d 255 (2016).]

"In criminal sexual conduct cases, a victim's testimony may be sufficient to support a defendant's conviction and need not be corroborated."  *Id.*  Here, as in *Solloway*, VG's age was not disputed, and she testified in great detail about the sexual assaults that had occurred.  Given this testimony, the evidence, viewed in the light most favorable to the prosecution, was sufficient to support defendant's convictions for CSC I.  *Id*.

Nor was the jury verdict against the great weight of the evidence.  "A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result."  *Id*. at 182-183 (quotation marks and citation omitted).  Questions regarding credibility are not sufficient to reverse a jury verdict unless the witness's testimony "contradicts indisputable facts or laws, the testimony is patently incredible or defies physical realities, the testimony is material and . . . so inherently implausible that it could not be believed by a reasonable juror, or the testimony has been seriously impeached and the case is marked by uncertainties and discrepancies."  *Id*. at 183 (quotation marks and citation omitted).

None of these factors is present here.  Defendant points out that VG testified that she did not remember if she cried when defendant penetrated her and that there was no bleeding, and that Dr. Guertin found it "a little surprising" that she did not report painful defecation.  VG's mother also did not recall VG being constipated or complaining of pain in her anal area.  However, Dr. Guertin testified that it was not a given that a child suffering the type of abuse alleged by VG

---

[6] A supplemental appellate brief filed in propria persona by a criminal defendant under Supreme Court Administrative Order 2004-6, Standard 4.

would suffer painful defecation or have bleeding. Dr. Guertin did testify that VG told him that it hurt when she was penetrated. Nothing about VG's testimony is contradictory of indisputable facts, patently incredible, or inherently implausible, nor was her testimony seriously impeached. *Id*. Further, the fact that Dr. Guertin's examination did not reveal indisputable evidence of sexual assault does not render VG's testimony patently incredible, inherently implausible, or seriously impeached. *Id*. Defendant's convictions were not against the great weight of the evidence.

Affirmed.


/s/ Mark T. Boonstra
/s/ Kathleen Jansen